**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Donald Ervin SMITH, Defendant-Appellant.**

**No. 85–2734.**

United States Court of Appeals, Tenth Circuit.

Dec. 3, 1986.

David J. Richman, Coghill & Goodspeed, Denver, Colo. (John M. Richilano, with him on brief), for defendant-appellant.

Steve Korotash, Asst. U.S. Atty., Oklahoma City, Okl. (William S. Price, U.S. Atty., and Ted A. Richardson, Asst. U.S. Atty., Oklahoma City, Okl., on brief), for plaintiff-appellee.

Before McKAY and MOORE, Circuit Judges, and BROWN, Senior District Judge.*

WESLEY E. BROWN, Senior District Judge.

Count I of the indictment in this criminal action charged that from September, 1982, to December 6, 1984, at Oklahoma City, Chicago, Corpus Christi and other locations, the defendant-appellant, Donald Ervin Smith, and his co-defendants Ernest Burton, a/k/a Tom Burton, and William A. Vandiver, of Chicago, Illinois, conspired together, and with Paul Duane Cawthon, George Wesley Cawthon, Robert Dean Phillips, John Randall Lecas, and others, to distribute Dilaudid, a Schedule II narcotic substance, in violation of 21 U.S.C. Sec. 846. Smith was also charged with three counts of interstate travel to promote the distribution of Dilaudid, in violation of 18 U.S.C. Sec. 1952 (Counts 3, 7 and 11, travel on November 2, November 10, and Novem-

---

* Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation.

ber 29, 1983), and with three counts of distribution of Dilaudid in violation of 21 U.S.C. Sec. 841(a)(1) (Counts 5, 9, and 13, sales on November 2, November 10, and November 29, 1983). Smith was tried separately from his co-defendants, and was found guilty on all seven counts.[1] This appeal follows.

Smith contends that the evidence submitted by the government was at "fatal variance" with the specific dates alleged in the indictment, and therefore the evidence was insufficient to sustain his convictions. He also contends that sufficient independent evidence of the existence of the conspiracy did not exist, and therefore his conviction on the conspiracy count cannot stand.

The government's evidence consisted of the testimony of the co-conspirators, Paul Duane Cawthon, Robert Dean Phillips, and John Randall Lecas, and other witnesses who supplied corroborating evidence. Viewing the evidence in the light most favorable to the prosecution, it was established that a conspiracy existed among those named in the indictment, whereby Robert Phillips and appellant Smith, who operated bars in Houston and Corpus Christi, purchased wholesale quantities of Dilaudid from their Chicago suppliers, Vandiver and Burton, taking delivery in Oklahoma City, Arkansas, or Chicago. Phillips and Smith then sold the tablets to the Cawthon brothers in Oklahoma City, and they, in turn, resold to their street dealers.

Tim Brown, an Oklahoma City police officer testified that he arrested Paul and George Cawthon on a city street in April, 1984, and a search of their car produced a large quantity of Dilaudid tablets, and thousands of dollars. On June 22, 1984, Officer Brown participated in another arrest of Paul and George Cawthon at their apartment, at which time a large quantity of Dilaudid and another large sum of money were seized. Both Cawthon brothers were charged with possession of Dilaudid with intent to distribute.

Paul Cawthon testified that he used drugs in Vietnam in 1965–1967, and in 1980 became addicted to heroin, methadone and Dilaudid. In September, 1982, he began dealing in drugs himself, with his first supplier being one "Pops Brooks" in Oklahoma City. He then bought from Robert Dean Phillips and Larry Church two or three times and when they quit business, he was obliged to go to Houston for a supplier, where he paid $27 per tablet. Robert Phillips then approached him with an offer of $26 per tablet, and the Cawthons began buying from him in Oklahoma City. Cawthon testified that he met Smith one time at one of the drug transactions. After Phillips became sick, deliveries were made to Cawthon by John "Lou" Lecas. All of these deliveries were made in Oklahoma City, with cash transactions of $20,000 to $50,000 per trip. Cawthon testified that he sometimes purchased 1,000 Dilaudid tablets per week.

Robert Dean Phillips, one of the conspirators, testified that he had known the defendant Don Smith since 1970, and that when he first went into the drug business in 1982, Smith put up the money—$12,500, with which they bought 500 Dilaudid tablets from a supplier in Houston, and which they sold to one Larry Church, a dealer in Oklahoma City. Phillips testified that he moved up to Oklahoma City in order to "protect the money," and that from time to time, Smith came up to Oklahoma City to get his share of the profits. After seven months or so in Oklahoma City, the dealer Larry Church was arrested so Phillips and Smith quit the drug business and Phillips moved back to Texas, staying for a while with Smith and his wife in Corpus Christi.

1. 21 U.S.C. Sec. 841(a)(1) provides that "it shall be unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance...."

21 U.S.C. Sec. 846 provides that "any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which the object of the attempt or conspiracy."

Phillips testified that in September, 1983, he and Smith started up in the drug business again, this time buying their Dilaudid from Tom Burton, an old friend from Chicago. Phillips testified that he and Smith picked up drugs from Burton in Memphis, Forest Hills, Arkansas, and in Oklahoma City where they met Burton at the Southgate, Continental or Grand Continental Motels. Phillips stated that he had met Burton at the Southgate four or five times and he testified that defendant had travelled with him to Oklahoma City eight or nine times, and that from September to December, 1983, he made three to four trips a month to Oklahoma City, distributing drugs to the Cawthon brothers.

Phillips testified that when he became ill in mid-December, 1983 and was in the hospital for two weeks, John Lecas, an old acquaintance, took over pick-up and deliveries for him.

John Lecas testified that he owned a bar in Houston, had known Phillips since Chicago days in 1964, and that he became acquainted with defendant Smith about 1969. His evidence was that in December, 1983, Phillips asked him to make a trip to Oklahoma City with Smith to deliver drugs to the Cawthon brothers and that he did so. They travelled in Smith's car to Oklahoma City, where they sold 1500 tablets of Dilaudid for $30,000 to $40,000 cash at the Continental Motel on I–35 South. Don Smith carried a gun on the occasion the money was paid to Smith. Lecas was paid $500 for the trip, and while Smith talked about splitting profits three ways with Lecas, that never happened. Lecas testified that he agreed with Phillips to make trips through March and April, 1984. He picked up tablets from Burton or Vandiver in Chicago, sold them to the Cawthons in Oklahoma City, and then took the money back to Phillips in Texas. Lecas stated that he was paid $1.00 per tablet for this service,

and that Phillips and Smith divided the profits.[2]

Other independent evidence corroborated the testimony of Phillips, Lecas and Cawthon. Registration cards for the Southgate Inn on South I–35 in Oklahoma City were introduced in evidence. The registrations were for September 30, October 8, 9, 15, 26, November 2, 10, 12, 17, 1983—and for January 13, 29, February 3 and 14, 1984. Each card indicated the number of people using the room. The registration for October 9 was in the name of Tom Burton. All others were in the name of Robert Phillips. The desk clerk was able to identify Robert Phillips because he had noticed and admired his jewelry.

Telephone records were introduced listing toll billing charges to Don Smith's credit card number in Corpus Christi from September, 1983 to January, 1984. These calls were to telephone numbers for the various parties involved in the conspiracy, in Houston, Oklahoma City, and Chicago. Some of the calls charged to the Smith account were made from Purcell, near Oklahoma City on September 10, October 4, 18, 23, 26, 29, 30, and November 4 and 16, 1983. Some of these calls were made *to* the Don Smith number in Corpus Christi. Mrs. Smith testified that she knew Robert Phillips and Tom Burton, but did not know the other conspirators. She stated that she had never called any of these people on the Smith credit card.

■ The indictment in this case charged Smith with travel and distribution "on or about" the dates of November 2, 10 and 29, 1983. The court instructed the jury that the proof as to dates "need not establish with certainty the exact date of any alleged offense because it (was) sufficient if the evidence in the case established beyond a reasonable doubt that the offense charged

**2.** On January 4, 1984, Smith surrendered himself to federal authorities and since that time has been serving a sentence imposed in Louisiana for smuggling marijuana. The evidence in the case before us tended to prove that Smith continued to receive profits from the Oklahoma City operation even though he was serving the federal sentence.

were committed on dates reasonably near the dates alleged." Such an instruction was appropriate and proper under the law of this Circuit. *Tafoya v. United States*, 386 F.2d 537 (10 Cir.1967), and see, *United States v. Francisco*, 575 F.2d 815 (10 Cir. 1978). The evidence discussed above was sufficient to sustain Smith's convictions on the travel and distribution counts "on or about" the dates mentioned in the indictment.

■ With respect to the conspiracy count, defendant contends that the proof failed because the testimony of his co-conspirators was inadmissible to prove any act which occurred out of his presence. For this proposition, defendant cites *Glover v. United States*, 306 F.2d 594 (10 Cir.1962) which concerned the admissibility of *hearsay* statements. Such citation is inappropriate for the government produced direct evidence of the actual acts and conduct of the defendant, all of which were sufficient to prove Smith's knowledge of the distribution scheme, his possession and distribution of drugs, and his partnership in the scheme to distribute Dilaudid in Oklahoma City.

The credibility of the witnesses and the persuasiveness of the documentary evidence were matters for the jury to decide, and in this case, the jury found sufficient evidence to convict.

■ Smith contends that the guilty pleas of his co-conspirators were used as substantive evidence against him, thereby resulting in prejudicial error requiring retrial.

Each of the three co-conspirators who testified for the government, Cawthon, Phillips and Lecas, testified to the fact that he had pled guilty to an offense relating to his involvement in the scheme described in the indictment here. In cross examining Smith who testified on his own behalf, the prosecutor asked:

"Q. I guess my final question then is along this line. Everybody that has come into this courtroom under oath that

have already either been in prison or plead guilty in connection with the dope deals that you all were doing have come in and not told the truth about your involvement?"

In addition, the prosecutor noted in closing arguments that each witness had pled guilty to a charge connected with the Dilaudid distribution scheme, and the remark was made that "at least Robert Dean Phillips was man enough ... He was a convicted felon." The prosecutor continued:

"I never asked you to like him, just listen to him. And, as we say in this business, you don't find swans in sewers. The type of people that are dealing in narcotics and Dilaudid, and what-not, are his very type, and you have to pull them out of prisons to testify...."

\*  \*  \*  \*  \*  \*

"Mr. Lecus. He plead guilty to a telephone count. He told you he wasn't using drugs. He went in December with this man to Oklahoma City, was present when the drugs were transferred, saw the money. They had these briefcases with the "357", as in the gun, combination. That's all verified."[3]

No instructions whatsoever were given to the jury concerning the nature or effect of the co-conspirators guilty pleas.

Under our decisions in *United States v. Baez*, 703 F.2d 453 (10 Cir.1983), and *United States v. Austin*, 786 F.2d 986 (10 Cir. 1986) we are obliged to reverse and remand this case for new trial.

In *Baez*, we ruled that a co-defendant's guilty plea may not be used as substantive evidence of guilt. If a co-defendant does testify, evidence of his guilty plea may be elicited in order that the jury may fully consider the credibility of the witness, but in such circumstance, "(b)ecause of the potential for prejudice, cautionary instructions limiting the jury's use of the guilty plea to permissible purposes are *critical.*"

---

**3.** Phillips testified that he and Smith had identical briefcases, with combinations "357", "like the gun". These were used to carry drugs and money. Both Phillips and Lecas testified that in

December, 1983 the drugs were carried in Phillips' briefcase. Phillips testified that Lecas and Smith came to his hospital room to pick up that briefcase.

(Emphasis supplied) In *Austin, supra,* where we noted that the general rule applies to convictions of co-conspirators, as well as to convictions of co-defendants, the jury was informed in opening and closing statements and through the testimony of the government's chief witness and others, that ten co-conspirators had been previously tried and convicted for their participation in the conspiracy with which the defendants were charged. As in this case, no cautionary instructions were given. We there found plain error, and reversed for new trial: (786 F.2d at 992)

> "Although two of the previously convicted co-conspirators did appear as Government witnesses and testify to their prior convictions, no cautionary instruction was given informing the jury that this evidence was limited to the issue of credibility, and admonishing the jury that the convictions could not be considered as substantive evidence of guilt.
>
> "In Baez we held that putting evidence of co-defendants' convictions before the jury in the absence of a permissible purpose, or without a cautionary instruction limiting the jury's consideration to a permissible purpose, constituted plain error affecting substantial rights under Fed.R. Crim.P. 52(b).

"We reach the same conclusion here. Upon considering the entire record, we 'cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error....' (citing *Baez,* 703 F.2d at 455)...." (footnote omitted)

Although defendant's counsel did not object or request special instructions with regard to evidence of the guilty pleas, we find plain error affecting the substantial rights of the accused, even though there was no objection. *United States v. Baez, supra,* 703 F.2d at 455. In view of the nature of a conspiracy trial, with the government's case in chief coming from co-conspirators who had pled guilty, and considering the nature of the prosecutor's arguments and comments to the jury which were directed to the theme that "birds of a feather flock together," we find also plain error which adversely affected Smith's right to a fair trial.

We do not address appellant's other contentions concerning prosecutorial misconduct and ineffective assistance of counsel since defendant is to have a new trial in any event.[4]

**4.** Among other suggestions, defendant complains that the prosecutor attempted to connect him with the activities of his former club manager—one Tommy Teutsch, a fugitive on the FBI "Most Wanted" list, sought in connection with an entirely unrelated drug investigation and involvement in 6 or 8 murders.

In extensive cross examination of a defense witness, the prosecutor, without objection, inquired at length into Teutsch's criminal activities and violent nature, until the Court was obliged to reprimand him:

"THE COURT: Mr. Richardson, let's leave U.S. versus Teutsch for another Court at another time, and let's try the case of U.S. versus Smith from now on.

Even after this admonition, the prosecutor again referred to Teutsch's bad character in his closing argument, mentioning that he was employed by Smith, and that Smith's wife had put up bail money for Teutsch:

"But we know this, that Tom Teutsch isn't on trial, of course, just like the Judge reminded me quite clearly. But the idea is that there is a man just about as bad as anybody you have

heard about in this trial, and he was associated not with Robert Dean Phillips or Mr Lecus or the Cawthons, but he was tied in hand and glove with Don Smith.

"Lucy Smith tells you she's a bartender, or something along those lines. Well, it's on the toll records before us. It lists her as the manager of the Tokyo Massage Parlor, whatever that means.

"But, okay, the Smiths go the $3,000 (for bail) and Teutsch jumps bond, and he (Teutsch's attorney) just casually talks about the idea he represents him, he was the most wanted man in the United States, he kills, he—or, as he said, he's accused of all these things, but he (the attorney) gets him off. He kills, he murders, he is Mr. Tough Guy, and he's working for the Smiths."

\* \* \* \* \* \*

"Let him (the defendant) say all the bad, evil things in the world he wants to say about Robert Dean Phillips, because the thumb's coming right back to that drug-dealing defendant. His friend was Tommy Teutsch, blah, blah, blah, not ours."

For the reasons discussed above, the judgment is REVERSED, and the case is REMANDED FOR NEW TRIAL.