**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 14, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

STEWART WAYNE COFFMAN,

    Defendant - Appellant.

No. 23-7058
(D.C. No. 6:21-CR-00324-EFM-1)
(E.D. Okla.)

_____

### ORDER AND JUDGMENT*

_____

Before **PHILLIPS**, **CARSON**, and **FEDERICO**, Circuit Judges.

_____

On October 7, 2017, firefighters in Idabel, Oklahoma responded to a call about a fire at Stewart Wayne Coffman's dwelling. After battling the blaze in Coffman's trailer, firefighter Roger Williams checked Coffman's backyard for fire extension. Instead of embers, he found the body of Joseph Freeman Battiest, Jr.

Coffman was tried before a jury and convicted on June 16, 2022, of (1) second-degree murder in Indian Country, in violation of 18 U.S.C.

_____

\* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

§§ 1111(a), 1151, and 1152, and (2) assault with a deadly weapon in Indian Country, in violation of 18 U.S.C. §§ 113(a)(3), 1151, and 1152. Coffman was sentenced to 300 months on Count 1 of the Superseding Indictment and 120 months on Count 2 of the Superseding Indictment, to be served concurrently. Judgment was entered on August 17, 2023. Coffman timely appealed, arguing that there was not sufficient evidence to support his conviction for second-degree murder. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

**I**

On the evening of October 5, 2017, Tabitha Jones, Anthony Quint Jones, Shawn Mooney, and Battiest were gathered at Coffman's trailer in Idabel, Oklahoma. Mooney, Battiest, and Coffman had been consuming alcohol throughout the day and into the evening. At one point in the evening, while Coffman was inside his trailer, Mooney and Battiest had a physical altercation on the front porch. Mooney fell and hit his head on a brick, which reopened a prior head wound. Battiest also sustained injuries and was bleeding from his mouth or lip. An ambulance was summoned to take Mooney to the hospital.

Following the altercation and Mooney's departure, Coffman appeared outside on the porch and stated to Battiest, "I told you to leave." R. III at 135. Tabitha Jones testified that she saw Coffman take a metal pipe out of

2

the trailer and asked Battiest to leave multiple times. Tabitha Jones testified that Coffman stated aloud, "[i]f you don't want to see this, you better leave." *Id.* at 80. At that point, the Joneses opted to leave the property. As Anthony Jones was leaving, he picked up Battiest's mobile phone and Coffman stated, "[y]ou can have that." *Id.* at 138. Anthony Jones testified that he told Coffman that he would return the mobile phone to Battiest.

Anthony Jones further testified that as they were leaving, he saw Coffman pick up a metal pipe that had been located under the porch, and saw Coffman swing the pipe, but he did not see him make contact with Battiest. While leaving Coffman's property, Anthony Jones heard a "thud," "like the pipe hitting a body or whatever[.]" *Id.* at 137.

Tabitha Jones testified that she heard sounds of impact, like "clinks," approximately six times. *Id.* at 65–66, 80–81. As she was walking away, Tabitha Jones turned back and saw Coffman strike Battiest with the pipe; however, she could not specify what area of Battiest's body Coffman was striking. While they differed in their testimony regarding whence Coffman retrieved the pipe (i.e., from inside the trailer versus under the porch), the Joneses both testified that Coffman had a metal pipe in his hands when they left Coffman's property, that they saw Coffman either raise the metal pipe or strike Battiest, and that they heard sounds of impact.

3

Approximately three to four hours later, the Joneses returned to Coffman's property to return the mobile phone. Anthony Jones testified that when he inquired about Battiest, Coffman stated, "Joe walked off." *Id.* at 139.

Joe Norris – a neighbor living in a camper approximately ten feet behind Coffman's trailer – testified that on that evening, Coffman came to his door and asked if he or his spouse, Tamina Norris, had a flashlight that he could borrow. Joe Norris testified that Tamina Norris gave a flashlight to Coffman, Coffman then walked back around to the front of his trailer, and then Joe Norris heard some "thumping" noise. *Id.* at 167–68. Joe Norris described the noise as a "thumping sound, it was a hollow -- a hollow thump coming from the PVC." *Id.* Joe Norris testified that he later looked out his window and saw Coffman outside, standing with a flashlight shining on the ground. Specifically, Joe Norris testified:

Q. When was that in relation to that thumping that you heard?

A. The thump I heard, and then about 20 -- 20 minutes later, I believe, it was him out here with a flashlight (indicating).

Q. So you heard the thump first?

A. Yes.

Q. Specifically with the thump, did you hear anything else?

A. I heard -- I heard someone yelling "Stop."

Q. How many times did you hear that?

4

A. Three times.

Q. Did you hear any other noises?

A. No. Just gurgling.

Q. When was that in relation to the "Stop"?

A. Right after the word "Stop" come out, I heard the gurgling. After the third time, it quit.

Q. When was that in relation to the thumping?

A. The same time.

Q. Were you able to determine whose voice it was saying "Stop"?

A. Not until later.

Q. Did you take sometime to think about it?

A. I thought about it, and I didn't -- I didn't know.

*Id.* at 169.

The following day, Battiest failed to report for work at the Nutrition Center, where Battiest helped deliver meals to elderly and disabled individuals. Brady Fuller, a former colleague, testified that she called Battiest when he failed to come to work or drive his route; however, she did not get a response each time she called. Moreover, Battiest did not call in sick that day. *Id.* Fuller testified that Battiest was a reliable employee who did not usually take leave.

Two days later, at approximately 10:00 a.m. on October 7, 2017, a fire broke out in Coffman's trailer and the Norrises called 911. Williams, a firefighter in Idabel, responded to the call and located Battiest's body behind Coffman's trailer. Williams testified that:

> I went around. And as I'm looking for fire I looked down and saw the PVC, and my mind went to plumber, and I was wondering why there was excrement in my mind on the outside of the PVC. It didn't make sense, and I just kind of -- and then I followed it, and then I saw a body.
>
> * * *
>
> Uh-huh, just -- after I went to the front -- or in some order, maybe I went to the front, I don't -- when I knelt down, I wasn't quite sure and I got to looking, and I think I went to the front and I got maybe Joe Norris and I said, "Man, tell me that's not who I think it is," and he come back and he's like, "Yeah, it's who you think it is."

*Id.* at 283–84.

While the fire was being put out, Coffman waited with the Joneses. Tabitha Jones testified:

> [H]e walked over to the park, and we went and hung out a little bit and was talking, and I asked him what happened. He said, "Someone set my house on fire." And then after that he said, "They found a body." And I said, "Are you serious?" And then he said, "Yeah." I said, "Whose was it?" And he didn't tell us. And then after that he looked kinda weird, and I said, "What'd you do, kill somebody and then set the house on fire and say -- you know, try to cover it up?" and he went "Yeah."

*Id.* at 72.

6

Coffman was then detained and placed in an Oklahoma State Bureau of Investigation (OSBI) vehicle. While Joe Norris was speaking to an OSBI agent, Coffman called him and then hung up. When Coffman called Joe Norris again, the OSBI agent instructed Joe Norris to place the call on speakerphone. Joe Norris testified that:

> The phone, when I picked it up, I heard Stewart Coffman in the car on my phone telling me, "Joe, I fucked up. I really fucked up." I looked at the OSBI agent, and he looked at me, and he says, "You did hear that, didn't you?" I said, "Yes, I heard that." I said, "Did you hear it?" And he said, "Yes." And then he hung up.

*Id.* at 177.

Additionally, Leonard Williston, a resident of Idabel, testified that approximately two or three days before Battiest's body was found, Coffman told him that the victim "went to his old lady's house, told her that he was cheating on her, and . . . he said he couldn't believe that he did that and that he was going to get him." *Id.* at 357–58.

Dr. Ross Miller, a forensic pathologist with the State of Oklahoma, determined that the probable cause of Battiest's death was "multiple blunt force injuries" that were primarily identified on the head and bilateral lower legs. *Id.* at 433–35. In addition to multiple lacerations to the skin on the right and left side of the head, there were deep soft tissue hemorrhages, significant subdural hemorrhage within the skull, and a complex skull

7

fracture to the right side of the head. Dr. Miller identified a mark that he considered to be a toolmark on the right side of the skull, which was "a linear or elliptical mark." *Id.* at 435. During cross-examination, Dr. Miller conceded that he could not identify what type of object was used to cause the toolmark; however, he did agree that the edge of a metal pipe would be consistent. Moreover, Dr. Miller testified that Battiest had extensive fractures to both tibias. Finally, Dr. Miller noted decomposition to Battiest's body as well as maggots and insect activity.

The jury trial was held on June 14-16, 2022. After the Government rested its case, Coffman moved under Federal Rule of Criminal Procedure 29 for a judgment of acquittal. The district court denied the motion, which Coffman unsuccessfully renewed at the close of all evidence.

The district court instructed the jury on both first-degree and second-degree murder in Indian Country. On June 16, 2022, the jury found Coffman (1) not guilty of first-degree murder in Indian Country; (2) guilty of second-degree murder in Indian Country, and (3) guilty of assault with a dangerous weapon in Indian Country. Coffman timely appeals.

## II

### A

Coffman now challenges the sufficiency of the evidence regarding his conviction for second-degree murder in Indian Country. We begin by setting

8

out the standard of review, then proceed to the elements of the offense at issue in this appeal, and we conclude by analyzing the evidence to determine whether it is sufficient to sustain Coffman's conviction.

Of note, Coffman is not appealing his conviction for assault with a deadly weapon in Indian Country. Rather, Coffman argues on appeal that the Government did not sufficiently prove that he killed Battiest and that his verdict is based upon multiple, impermissible inferences. Thus, he requests that this court vacate his conviction for second-degree murder and remand his case for resentencing on the assault conviction.

"Sufficiency of the evidence is a question of law reviewed de novo[,]" wherein we review the evidence and reasonable inferences drawn therefrom in the light most favorable to the Government. *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999); *see also United States v. Wood*, 207 F.3d 1222, 1228 (10th Cir. 2000). We examine whether "any rational trier of fact could have found the defendant guilty of the crime beyond a reasonable doubt." *Wood*, 207 F.3d at 1228. "The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Wilson*, 182 F.3d at 742 (internal quotation marks and citation omitted). Jurors, however, are not permitted to speculate, and "we will reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable

9

doubt." *United States v. Xiang*, 12 F.4th 1176, 1184 (10th Cir. 2021) (internal quotation marks and citation omitted); *United States v. Arras*, 373 F.3d 1071, 1073 (10th Cir. 2004).

**B**

To sustain a second-degree murder conviction, the Government must prove beyond a reasonable doubt that Coffman unlawfully killed a human being with malice aforethought. *Wood*, 207 F.3d at 1228 (citing 18 U.S.C. § 1111(a)). Malice aforethought means "either to kill another person deliberately and intentionally, or to act with callous and wanton disregard for human life." *United States v. Sago*, 74 F.4th 1152, 1156 (10th Cir. 2023) (citing Criminal Pattern Jury Instruction Committee of the United States Court of Appeals for the Tenth Circuit, Criminal Pattern Jury Instructions 2.53 (2023 ed.)). The malice aforethought element is satisfied by (1) having the intent to kill without premeditation and deliberation; (2) having the intent to do serious bodily injury; (3) having a depraved heart; or (4) "commission of a felony when the felony in question is not one of those specified in the [first-degree] murder paragraph of § 1111(a)." *United States v. Pearson*, 159 F.3d 480, 486 (10th Cir. 1998); *see also United States v. Soundingsides*, 820 F.2d 1232, 1237 (10th Cir. 1987) ("Malice aforethought may be established by evidence of conduct which is reckless and wanton, and a gross deviation from a reasonable standard of care, of such a nature

10

that a jury is warranted in inferring that the defendant was aware of a serious risk of death or serious bodily harm.").

Coffman does not challenge the jury's findings that Battiest was assaulted, that Battiest was unlawfully killed, and that the killing was committed with the requisite malice aforethought. The parties also do not contest that Battiest was found in Indian Country, that Battiest was Indian, and that Coffman is non-Indian.[1]

Rather, Coffman argues that the jury relied upon speculation and conjecture in concluding that *he* killed Battiest and, therefore, the evidence does not support the jury's guilty verdict beyond a reasonable doubt. Specifically, Coffman argues that there was a lack of (1) "eyewitness testimony about death resulting from the assault"; (2) "forensic evidence connecting Coffman to Battiest's death"; and (3) "rational explanation for where, when, and why Battiest was found dead if Coffman had killed him nearly two days earlier." Op. Br. at 31. Coffman's arguments are unavailing.

---

[1] According to the General Crimes Act, 18 U.S.C. § 1151, et. seq., the Indian status of either the victim or defendant is an essential element of the offense charged. *See* 18 U.S.C. § 1152; *United States v. Simpkins*, 90 F.4th 1312, 1314, 1317–18 (10th Cir. 2024) ("[18 U.S.C. § 1152] extends the general laws of the United States to Indian [C]ountry, yet it applies only if either the victim or the defendant—but not both—is an Indian.").

## C

After examining the evidence presented at trial and viewing it in the light most favorable to the Government, we easily find the evidence sufficient to support Coffman's conviction for second-degree murder. A conviction may be founded on circumstantial evidence; thus, "it is not required that an appellate court exclude every reasonable hypothesis, but only that it find that a jury might reasonably have done so." *United States v. Davila*, 693 F.2d 1006, 1007 (10th Cir. 1982).

Williston's testimony established that Coffman was angry at Battiest for informing his girlfriend that Coffman was cheating on her and that Coffman said he was "going to get him." R. III at 358. Hence, from the outset, there is at least some evidence of motive.

Coffman contends that the Joneses' testimony does not support his conviction because they only witnessed him assaulting Battiest; thus, there is no witness or direct evidence supporting Coffman's commission of second-degree murder. An eyewitness, however, is not required for a jury to find a defendant guilty beyond a reasonable doubt. *Matthews v. Workman*, 577 F.3d 1175, 1185 (10th Cir. 2009); *see also Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *Holland v. United States*,

12

348 U.S. 121, 140 (1954) ("Circumstantial evidence in this respect is intrinsically no different from testimonial evidence.").

Most significantly, the Joneses saw Coffman with the pipe in hand and then heard sounds of the impact of the pipe being used. Tabitha Jones saw Coffman strike Battiest approximately six times.

Also, Coffman borrowed a flashlight from his neighbors and Joe Norris saw Coffman go to the front of his property with the flashlight. Joe Norris then heard thumping sounds, heard someone yell "stop" three times, and then heard gurgling. *Id.* at 169. After approximately twenty minutes, Joe Norris saw Coffman standing at the back of his property with the flashlight shining on the ground (and in the general area where Battiest's body would be discovered on October 7, 2017).

The next day, on October 6, 2017, Battiest did not report to work, even though his coworker, Fuller, testified he was always reliable and not taking leave. Moreover, when Battiest's body was discovered behind Coffman's trailer and on Coffman's property, Coffman called Norris and stated, "Joe, I fucked up. I really fucked up." *Id.* at 177. This call was witnessed by an OSBI agent. Finally, the forensic examiner established that there was a toolmark visible on Battiest's skull, which could be consistent with the edge of a pipe.

In totality, this evidence was sufficient for a jury to infer and conclude that (1) Coffman had a motive to harm Battiest, (2) Coffman acted with malice aforethought and beat Battiest with a metal pipe on the night of October 5, 2017, (3) which resulted in Battiest's death between October 5 and October 6, 2017, (4) that Battiest's body was left behind Coffman's trailer and at the back of Coffman's property, (5) that Battiest's body was discovered on October 7, 2017, and (6) that Coffman made admissions regarding the killing of Battiest.

The court will not delve too deeply into Coffman's argument about a lack of a "rational explanation for where, when, and why Battiest was found dead if Coffman had killed him nearly two days earlier." Op. Br. at 31. Rather, the evidence supporting the conviction is rational enough that we need not speculate as to all other hypotheses, not argued by Coffman, as to how these events could have otherwise unfolded. *United States v. Summers*, 414 F.3d 1287, 1293 (10th Cir. 2005) ("We will not weigh conflicting evidence or second-guess the fact-finding decisions of the jury."); *see also United States v. Flechs*, 98 F.4th 1235, 1243 (10th Cir. 2024), *cert. denied*, No. 24-5131, 2024 WL 4427368 (U.S. Oct. 7, 2024).

14

## III

Accordingly, we **AFFIRM** Coffman's convictions and sentence.

Entered for the Court

Richard E.N. Federico
Circuit Judge

15